**FOSTER–MILLER, INC.**

v.

**BABCOCK & WILCOX CANADA.**

**Civil Action No. 93–12465–RGS.**

United States District Court,
D. Massachusetts.

Aug. 1, 1997.

James J. Foster, Boston, MA, for Plaintiff.

Peter L. Resnik, Cherie L. Krigsman, McDermott, Will & Emory, Boston, MA, for Defendant.

*MEMORANDUM ON BABCOCK & WILSON CANADA'S OMNIBUS MOTION FOR DISPOSITIVE RELIEF*

STEARNS, District Judge.

Foster–Miller, Inc. ("FMI") brought this action against a competitor, Babcock & Wilcox Canada ("BWC"), claiming that BWC violated a confidentiality agreement and misappropriated FMI trade secrets. Personal jurisdiction is premised on a meeting FMI held in Waltham, Massachusetts with one of its clients, Ontario Hydro. BWC attended the meeting as an observer. In its third attempt at brevis disposition, BWC asks for

summary judgment on FMI's outstanding claim, or in the alternative, dismissal for lack of personal jurisdiction or forum non conveniens.

### FACTS

The facts of this case have been detailed in two published decisions. See *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 848 F.Supp. 271 (D.Mass.1994), *rev'd and remanded,* 46 F.3d 138 (1st Cir.1995). I will recite only those of immediate significance. FMI is a Massachusetts corporation. Its principal business is the supply of sludge removal services to operators of nuclear steam boilers. FMI does not have offices in Canada but regularly solicits Canadian business. The creative force behind FMI is Robert A.S. Lee, the inventor of CECIL (the Consolidated Edison Combined Inspection & Lancing system), a robot that uses a flexible lance to direct a pressurized jet of water at sludge deposits in nuclear boilers. The flexible lance is the innovative aspect of CECIL, as it allows a 90° penetration of the heat exchange tube configuration found in most U.S. designed boilers. The patent to the CECIL technology is owned by Electric Power Research Institute, a District of Columbia corporation with headquarters in Palo Alto, California. The technology is licensed exclusively in the United States and Canada to FMI. CECIL is also protected by a Canadian patent.

BWC is a division of Babcock & Wilcox Industries, Ltd., a Canadian corporation with a principal place of business in Cambridge, Ontario. BWC builds and services "Candu" nuclear steam generators, the design preferred by the Canadian nuclear utility industry. The Candu boiler differs from its American counterpart in having more tightly configured heat exchange tubes. BWC is not licensed to do business in Massachusetts. It has no Massachusetts offices, owns no Massachusetts property, provides no services to Massachusetts customers, and does not solicit business in Massachusetts.

In 1988, FMI and BWC discussed, and then abandoned the idea of a joint venture to develop a technology to improve the cleaning of Candu boilers. The existing U.S. technology was essentially useless because of the compact "Candu" design. In 1989, FMI contracted separately with Ontario Hydro, a Canadian electrical utility, to study the feasibility of adapting FMI's CECIL technology for use by an association of companies known as the CANDU Owners Group ("COG"). Ontario Hydro awarded BWC a similar contract.

In 1990, James Malaugh, an Ontario Hydro representative and the COG contract administrator, was invited to a progress briefing at FMI's Waltham, Massachusetts office. Malaugh requested that Daniel St. Louis, a BWC engineer, attend as an observer. FMI insisted that BWC first sign a confidentiality agreement.[1] The agreement prohibited

---

1. The Agreement defined restricted confidential and proprietary information and excepted information as follows:

"FMI confidential, proprietary or novel information ("Information") shall mean and include any information in the form of all financial and statistical data, sales, and customer or client information, techniques, strategies, tactics, written or oral presentations, samples, prototypes, drawings, computations, processes, data, know-how and business plans pertaining to any matters discussed during the contact with FMI. All such Information shall not include material which the Party can by reasonable proof:

(1) Show that such Information, in its disclosed combination(s) is in the public domain through no fault of the Party.

(2) Show such Information is contained in a written record in the Party's files prior to the date of receipt from FMI.

(3) Show that a Party had at any time lawfully obtained said Information from a third party under circumstances permitting its disclosure and use.

(4) Show the Information is disclosed by FMI to others on a unrestricted basis.

(5) Demonstrate that such Information was independently developed by the Party or the Party's employees who had no access to the Information disclosed hereunder.

BWC from making use of any propriety information disclosed at the meeting without FMI's written permission. It also entitled FMI to damages and other relief in the event of a breach. William Schneider, BWC's Manager of Engineering, signed the Agreement in Canada on BWC's behalf. Schneider Decl. ¶5. The signed Agreement was faxed to FMI in Waltham.

During the May 11, 1990 meeting, FMI officials discussed aspects of FMI's "flexible lance" technology, and disclosed the identity of a key supplier, U.S. Composites, which had fabricated a Kevlar hose for use in an adapted version of CECIL. Present at that portion of the meeting were Malaugh, St. Louis, and two FMI employees, William Leary and Paul Belkus.[2] With regard to the Kevlar hose, Leary, who led the discussion, testified as follows:

Q. Was there any discussion about the hose construction during the May 11th meeting?

A. To the best of my knowledge, I mentioned that it was a double wrapped Kevlar hose.

Q. In what portion of your discussion did you mention that?

A. To the best of my knowledge, it was when I was describing the basic assembly of the hose and how the fittings were connected onto the hose. And in that discussion describing each component, the hose was included, and I mentioned that it was a double wrapper Kevlar hose.

Q. Did you say anything else about the hose?

A. To the best of my knowledge, I mentioned it had a nylon core and a urethane coating, and I can't recall saying anything else about it.

2. Possibly Margaret Campbell, another FMI employee, was in attendance. No one recalls her presence, including Campbell.

3. There were portions of the meeting from which St. Louis was excluded. St. Louis Dep., at 167–168. Belkus, Leary's boss and the program manager for the Ontario Hydro feasibility study, testified that he could not recall any of the specifics of the discussion of the hose. Belkus Dep., at 32.

Q. Did you have any discussion about the efforts that had gone into the development of that hose during the May 11th meeting?

A. I can't recall any discussion about the development of that hose. I believe what I told them was that we had just received this hose, and I was just beginning my fitting development program.

Leary Dep., at 51–52.

\*    \*    \*    \*    \*    \*

Q. All right. What aspect of the design of the hose and the fitting that you discussed in your meeting of May 11th did you consider to be novel, proprietary or trade secret?

A. The discussion of the development of fittings for this type of hose, and that type of hose being a Kevlar wrapped hose, I considered that proprietary.

Leary Dep., at 59.[3]

Following the meeting, St. Louis contacted Hugo Kruesi, the President of U.S. Composites, and inquired about obtaining a sample of FMI's Kevlar wrapped hose. Kruesi Dep., at 227–240. St. Louis had several additional conversations with Kruesi from May 25, 1990 through November 1990, during which they discussed technical aspects of the hose. *Id.* at 92–98, 235–240; St. Louis Dep., at 66–68, 174–177. After Kruesi informed FMI of the conversations, FMI asked that he have no further contact with St. Louis. Kruesi Dep., at 228–233. Kruesi complied. *Id.* at 233.

Sometime in 1990, St. Louis obtained a three inch exemplar of FMI's Kevlar hose from U.S. Composites. St. Louis Dep., at 68–69. BWC subjected the hose to destructive testing. *Id.*, at 90–91. In 1991, Ontario Hydro awarded a lucrative boiler cleaning contract to BWC.

Malaugh testified that he did not recall any specifics of the meeting and could neither confirm nor deny receiving any new information about the design of the FMI lance at the May 11 meeting. Malaugh states, however, that he knew, prior to the May 11, 1990 meeting, that FMI had obtained a Kevlar reinforced hose for use in the feasibility study. Malaugh Decl. ¶ 5.

## PROCEDURAL HISTORY

On November 12, 1993, FMI filed suit against BWC alleging breach of the confidentiality agreement, misappropriation of trade secrets, and unfair competition. On February 25, 1994, in a published decision, the district court granted BWC's motion to dismiss for lack of personal jurisdiction. FMI appealed. The Court of Appeals, disagreeing with the manner in which the district court had applied its choice of jurisdictional tests, reversed, and ordered that FMI be given the opportunity to conduct further discovery. See *Foster–Miller*, 46 F.3d at 151–152.

On May 26, 1995, BWC filed a motion to dismiss, claiming that FMI had failed to join an indispensable party, Ontario Hydro. In denying BWC's motion, the court observed that the

> conclusion that Ontario Hydro is not an indispensable party rests on FMI's characterization of its cause of action as involving only a contract dispute. The court considers this declaration binding on FMI. As the court made clear at the September 21, 1995 hearing, it views this litigation as involving three discrete issues, and three issues only. First, the contract dispute between FMI and BWC. Second, FMI's contention that but for the breach of that contract, BWC would not have been able to compete successfully with FMI; and third, that BWC's COG [Candu Owners' Group] contracts would as a result have gone to FMI.

November 16, 1995 Order, at 6–7 n. 5.

FMI, albeit reluctantly, accepted the court's ruling and agreed to limit its affirmative case to the alleged breach of the confidentiality agreement and any damages flowing from that breach.[4] BWC now contends that discovery has failed to establish the disclosure by FMI of any proprietary or trade secret information at the May 11, 1990 meeting, or the use by BWC of any such information in the development of its own hose.

4. The remaining counts of the Complaint (Count II—Misappropriation of Trade Secrets, Count III—Unfair Competition under c. 93A, and Count IV—Unfair Competition/Misappropriation) were

## DISCUSSION

*BWC's Request for Summary Judgment*

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "there is no genuine issue as to any material fact, and [where] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Gaskell v. Harvard Co-op. Society*, 3 F.3d 495, 497 (1st. Cir.1993). An issue is only 'genuine' if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor. *NASCO, Inc. v. Public Storage, Inc.*, 29 F.3d 28, 32 (1st Cir.1994). To succeed, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st. Cir.1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249–250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citations omitted).

Count I of the Complaint alleges that BWC breached the confidentiality agreement by exploiting information proprietary to FMI in the design and construction of its own flexible lance. BWC claims that FMI did not disclose any novel, proprietary or confidential information during the portions of the Waltham meeting that St. Louis attended, and that it knew the details of FMI's hose design long before it signed the confidentiality agreement. BWC also claims that FMI's hose and fittings designs were based on known prior art. Finally, BWC contends that it independently developed its own hose.

*Was Confidential, Proprietary and Novel Information Disclosed at the May 11 Meeting?*

■■ "A trade secret may consist of any ... compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Dynamics Research Corp. v. Analytic Sciences Corp.*, 9 Mass.App.Ct. 254, 273 n. 23, 400

waived by FMI. FMI reaffirmed its waiver of these counts at the hearing on this motion. Hearing Tr. of May 22, 1997, at 34.

N.E.2d 1274 (1980) (citation omitted). Designated as FMI's Rule 30(b)(6) witness, Leary testified that the confidential information shared with St. Louis at the May 11, 1990 meeting consisted of the identification of FMI's hose type (Kevlar braided), the fact that the hose had a urethane coating, the method by which barbed fittings were attached to the hose, and the fact that U.S. Composites was FMI's hose supplier.[5] FMI contends that its "unique" method of "wet braiding" the hose with a polyurethane matrix cover was developed in 1989 as part of a project it carried out for the U.S. Navy. See Boyce Dep., at 61–62; Babbitt Decl. ¶ 18. FMI maintains that Jay Boyce and Glenn Freitas, two of its employees, conceived the idea of using Kevlar, rather than stainless steel tubing, to house the lance. *Id.*, at ¶ 7. Charles Babbitt, another FMI employee who assisted in the project, testified that he worked with several hose manufacturers, including U.S. Composites, to develop a working prototype of the hose. *Id.*, at ¶¶ 7–18. "[N]o company ... was marketing a hose product that met, or had developed a hose design that would meet the dimensional, pressure retention, and flexibility requirements of the KAPL or Ontario Hydro applications." Boyce Decl. ¶ 19. Building on the concept of wet braiding Kevlar over a nylon liner, FMI worked "well over a year" to construct its unique, small-diameter, high pressure hose. *Id.*, at ¶ 16.

Disputing FMI's claim to innovation, BWC offers an FMI generated report to the U.S. Navy stating that wet-braiding was a "conventional technology in the composite industry." See BWC App., Ex. K, at 6; BWC Memorandum, at 27–28. BWC also points to Kruesi's testimony that FMI's hose design drew on standard and well-documented industry techniques. Kruesi Dep., at 29–33. FMI insists that Kruesi's testimony is "sus-

pect" because of his collaboration with St. Louis. FMI also contends that BWC misreads its report to the Navy. "What was conventional technology in the composite industry was what was listed in the second sentence, i.e., wet braiding with epoxy. or polyester." Boyce Decl. ¶ 21.

*Did FMI Protect the Secrets of Its Hose Technology?*

■ The hallmark of either a trade secret or a confidentiality agreement is secrecy. *Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 841–842, 282 N.E.2d 921 (1972). Malaugh (of Ontario Hydro) testified that FMI had told him about its Kevlar hose prior to the May 11, 1990 meeting. Malaugh Decl. ¶ 5. Also, on November 22, 1988, FMI and BWC sent Ontario Hydro a joint proposal to develop water jetting equipment that would include an intertubal lance with a Kevlar reinforced hose. Ribich Dep., at 290–291; BWC App. Ex. N. Finally, on May 18, 1990, FMI circulated a CECIL COG Progress Report, which disclosed that:

> [t]he primary hose section will consist of a double wrap of Keviar® fiber, which will increase the burst strength of the hose from 15,000 to 30,000 psi. A hose of double wrap was ordered and received. It will be tested as part of the mechanical fitting evaluation tests.

BWC App. Ex. Q. The FMI Report was not marked confidential.

FMI and Ontario Hydro had agreed to exchange documents under a protective agreement that required "for [any] such information to be considered confidential it must be received in hard copy and prominently marked as such." BWC App., Ex. R. FMI responds that it was custom and practice for FMI and Ontario Hydro to accord confidentiality to all inter-company disclo-

---

**5.** With regard to the confidentiality of the design of the fittings, Leary testified that "[b]asically designing the fitting such that the compression or the configuration ... of the barb and the compression of the collar was such that it would retain the integrity of the hose under pressure, yet not disrupt or cause undue sheer stress in this Kevlar type hose". Leary Dep., at 62. Leary also claims to have shared with St. Louis the failure modes FMI had encountered during the development process. *Id.*, at 61. "I made

him aware of the challenges that one would have to go through to design fittings for this type of hose". *Id.* BWC contends that none of this information is protected under the parties' agreement, and that Leary did nothing more than identify glitches in an unperfected design. The issue is in any event moot, as at the May 22, 1997 hearing, FMI's counsel acknowledged that, after full discovery, FMI was prepared to concede that the two fitting technologies bear no material similarity. Hearing Tr. of May 22, 1997, at 34.

sures whether labeled confidential or not. Schneider Dep., at 75–76; Lee Decl. ¶¶ 4 and 5; Belkus Decl. ¶¶ 8–10; Ribich Dep., at 85–86, and 267–286.

BWC also points to letters that FMI sent to hose vendors soliciting Kevlar hose samples without any intimation that the solicitation was confidential. FMI, relying on Babbitt's affidavit, contends that a confidentiality request was unnecessary because it was custom and practice among hose vendors to treat such inquiries as confidential. Babbitt Decl. ¶ 20–21. BWC points to Babbitt's contradictory deposition testimony in which he stated that he did not consider technical information disclosed in vendor solicitation letters to be proprietary. Babbitt Dep., at 66–71, 75–78, 84–89. BWC therefore asks that the court disregard Babbitt's affidavit. See *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4–5 (1st Cir.1994). However, in his deposition Babbitt also testified that he considered the contents of the solicitations "private" to FMI; "information that we wouldn't want sent out to other people". Babbitt Dep., at 175–178. Cf. *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir.1987) ("[T]he precincts patrolled by Rule 56 admit of no room for credibility determinations).

*Was FMI's Information in the Public Domain?*

BWC contends that the components of FMI's hose type and design were either in the public domain or were obvious extensions of known technology.[6] See *Prescott v. Morton Intern., Inc.*, 769 F.Supp. 404, 409 (D.Mass.1990) (a manufacturer cannot claim

trade secret protection for an everyday alteration of a known design). BWC's expert, Paul Lagace, a professor of mechanical engineering at the Massachusetts Institute of Technology, states that flexible hydraulic hoses with plastic cores and Kevlar reinforcement were commercially available in 1990. St. Louis testified that he had encountered such hoses prior to the May 11, 1990 meeting. St. Louis Dep., at 121–125. St. Louis also stated that he had obtained the disputed hose sample prior to travelling to Waltham. *Id.* at 77. Schneider of BWC recalled seeing the hose sample and discussing it with St. Louis sometime before the May 11, 1990 meeting. Hearing Tr., February 1, 1994, at 11–52. However, no one at BWC can specify where the sample came from or precisely when it arrived.

FMI argues that St. Louis's testimony is incredible, and that the tag attached to the hose sample proves that it came from U.S. Composites. As St. Louis had no contact with U.S. Composites prior to the May 11, 1990 meeting, FMI reasons that St. Louis could not have obtained the sample before the meeting. FMI Statement of Material Facts, at ¶ 14. According to FMI, searches conducted by Philip Lichtman in April 1988, Chip Babbitt in August 1988, and William Leary in December 1989, determined that no hose vendors were then producing a Kevlar hose sheathed in an impregnated polyurethane matrix.[7] Babbitt Decl., at ¶¶ 5, 6, 9, 10 and Ex. 1; Hearing Tr., February 1, 1994, 30–34; Boyce Decl., at ¶¶ 4–5.[8] BWC argues that FMI's various hose surveys are not probative of the state of the art in May 1990. However, BWC's own 1993 market survey

---

**6.** Citing the Restatement of Torts, § 757 definition of a trade secret, BWC argues that FMI cannot use a confidentiality agreement to cloak publicly available product information in trade secret garb. BWC Memorandum, at 58. Massachusetts has adopted § 757. *Burten v. Milton Bradley Co.*, 763 F.2d 461, 463 n. 2 (1st Cir. 1985).

**7.** BWC contends that FMI is estopped from raising the "impregnated polyurethane matrix" as a proprietary secret because Leary, FMI's Rule 30(b)(6) designee, failed to include the claim in the list of trade secrets he offered at his deposition. BWC's Memorandum, at 26. This seems too much a penalty for FMI to pay for what was likely an innocent omission. Additionally, be-

cause Babbitt's testimony regarding hose availability in 1988 is based upon Philip Lichtman's notes, BWC urges the court to disregard it as hearsay. But see Fed.R.Evid. 803(6).

**8.** BWC argues that Boyce is improperly designated and unqualified as an expert, and that his affidavit is not based upon personal knowledge. The court will accept those portions of Boyce's testimony that are based upon his personal involvement in FMI's hose development. I have also considered Boyce's opinion as to the comparison of the FMI and BWC hoses as I believe that he has sufficient training and experience to render such an opinion.

apparently located no comparable hose. Tarnawsky Dep., at 5–18.

*Did BWC Independently Develop its Hose?*

BWC contends that it independently developed a hose that differs materially from FMI's hose. The Kevlar hose used in the BWC lance was developed by Frank Kamler, a BWC engineer. Although Kamler was generally familiar with St. Louis's work, he claims to have developed the idea of braiding Kevlar onto the hose's nylon liner with a friend, Murray Latimer, an engineer at Barrday Corporation. Kamler Dep., at 25–26. Latimer testified that he machined the barbed inserts on the fittings using standard barb type fittings, and that he developed the barb design by trial and error. Latimer Dep., at 6–7. "Rather than using a compression collar that uses metal edges which can cut into the Kevlar hose, BWC tightly handwinds individual Kevlar fibers around the outside of the hose to compress the hose against the barbs inside the hose." BWC's Memorandum, at 43. Lagace claims that "the FMI and BWC hoses have sufficient differences such that they are different designs despite the fact that they use a basic configuration used in many hose applications and have similar materials as used in a number of hose applications." Lagace Decl. ¶ 2(1).

Tables 1 and 2 of Lagace's report contrast the features of the two hoses.[9] BWC heralds the comparison as demonstrating that its hose differs from FMI's in the angle of the Kevlar weave, the denier, the lack of urethane coating, and the choice of fittings. It is similar in its use of a double-wrapped Kevlar sheathing.

While FMI concedes that the concept of using Kevlar as a reinforcement medium had no proprietary significance in May of 1990, FMI points to the internal dimensions of the BWC hose, the coating of each strand of Kevlar with urethane, and the angle of the Kevlar weave as, in combination, an encroachment on FMI's trade secrets. See *Peggy Lawton Kitchens, Inc. v. Hogan,* 18 Mass.App.Ct. 937, 939, 466 N.E.2d 138 (1984) ("No doubt, the basic ingredients ... would be common to any chocolate chip cookie. The combination in which those ingredients are used ... constitute a formula which its proprietor could protect from infringement.") According to Boyce

> [t]he differences between Foster–Miller and early BWC hoses, such as the size of the denier of the Kevlar or a difference of several degrees in the braid angle, are not significant. Given the large number of materials available to choose from for liner, reinforcement, and protective cover, and the very large number of possible permutations and combinations of those materials in a hose, it is, in my opinion, extremely unlikely that St. Louis would, had he undertaken a development project similar to that performed by Foster–Miller, have arrived at the exact combination used by Foster–Miller ... completely original in the field of hose design during the time of interest (1990–1992).

Boyce Decl. ¶¶ 27 and 28. FMI contends that BWC's contacts with Kruesi, the reverse engineering tests it conducted on the sample hose obtained from U.S. Composites, and the overall similarity of the two finished products, creates a factual dispute as to whether BWC accelerated the development of its own hose by appropriating FMI's groundwork. See *Jet Spray Cooler,* 361 Mass. at 842–843, 282 N.E.2d 921.

To sum up: BWC argues that FMI failed to take reasonable steps to protect the "secret" aspects of its hose design; that the

9.

TABLE 1 COMPARISON OF HOSE CHARACTERISTICS

| Hose characteristic | FMI Hose | BWC Hose |
|---|---|---|
| Tube inner diameter | 0.071″ (0.078″) | 0.063 (0.066″) |
| Tube outer diameter | 0.096″ (0.097″) | 0.082″ (0.086″) |
| Kevlar denier | — (380) | — (195) |
| 1st braid layer angle | 55% (55.4°) | 50° |
| 2nd braid layer angle | 60° (62.5°) | 55° |
| Resulting hose outer diameter | 0.126″ | 0.094″ (0.101″) |

Appendix Ex. L, at 9–10.

design was based on prior art; and that BWC independently developed its own hose without needing or wanting any help from FMI. FMI counters that its disclosures to Ontario Hydro and prospective vendors were privileged by custom and practice; that its small-diameter, high pressure hose design was the result of a refinement of a prior novel technology; and that the similarities between BWC's hose and its own defy coincidence.

> [T]he decisive criterion on a summary judgment motion is not a comparative one. Fed.R.Civ.P. 56 does not ask which party's evidence is more plentiful, or better credentialed, or stronger. Rather, the rule contemplates an abecedarian, almost one dimensional, exercise geared to determining whether the nonmovant's most favorable evidence and most flattering inferences which can reasonably be drawn therefrom are sufficient to create any authentic question of material fact. Among other things, apart from that which may be inherently incredible, the nonmoving party is entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in [the evidence] resolved favorably to him. . . . "

*Greenburg*, 835 F.2d at 936 (citation omitted). While FMI's evidence might be viewed as thin when evaluated in the light of the counter-evidence produced by BWC, it raises matters of genuine factual dispute that cannot be resolved on summary judgment.

*Personal Jurisdiction*

■ When personal jurisdiction is challenged, a plaintiff bears the burden of demonstrating that jurisdiction exists. *Ealing Corp. v. Harrods Ltd.*, 790 F.2d 978, 979 (1st Cir.1986). As described in *Boit v. Gar–Tec Products, Inc.*, 967 F.2d 671, 675–678 (1st Cir.1992), three different methods of adjudicating disputes over personal jurisdiction have evolved, each with its own quantification of the plaintiff's necessary degree of proof. The most common is the *prima facie* test. It requires that a district court accept any affirmatively supported proffer of evidence by a plaintiff as true. If the proffered evidence, duly credited, is sufficient to support findings of all facts necessary to establish jurisdiction,

the plaintiff has met its burden. This is the standard the parties agree that I should apply.

FMI claims that personal jurisdiction attaches under the "transacting business" test of the Massachusetts Long–Arm Statute, G.L. c. 223A, § 3(a). Jurisdiction is conferred by the Long–Arm Statute "when some basis for jurisdiction enumerated in the statute has been established" and when "the exercise of jurisdiction under State law [is] consistent with basic due process requirements mandated by the United States Constitution." *Good Hope Indus., Inc. v. Ryder Scott Co.*, 378 Mass. 1, 5–6, 389 N.E.2d 76 (1979). Under § 3(a) of the Long–Arm Statute "the facts must satisfy two requirements—the defendant must have transacted business in Massachusetts, and the plaintiffs claim must have arisen from the transaction of business by the defendant." *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767, 625 N.E.2d 549 (1994). "[A]n assertion of jurisdiction must [also] be tested for its reasonableness, taking into account such factors as the burden on the defendant of litigating in the plaintiffs chosen forum, the forum State's interest in adjudicating the dispute, and the plaintiffs interest in obtaining relief." *Id.* at 773, 625 N.E.2d 549, citing *United Elec. Workers v. 163 Pleasant St. Corp.*, 987 F.2d 39, 46–47 (1st Cir.1993).

The transacting business test is liberally construed. It "embrace[s] any purposeful acts performed in Massachusetts whether personal, private, or commercial." *Johnson v. Witkowski*, 30 Mass.App.Ct. 697, 713, 573 N.E.2d 513 (1991). See *Carlson Corp. v. University of Vermont*, 380 Mass. 102, 105, 402 N.E.2d 483 (1980) (contract for work to be performed outside of Massachusetts); *Haddad v. Taylor*, 32 Mass.App.Ct. 332, 335, 588 N.E.2d 1375 (1992) (telephone calls and letters soliciting in-state business). The grounds for exercising personal jurisdiction over BWC under the first requirement of the transacting business test are St. Louis's attendance at the May 11, 1990 meeting in Waltham, Massachusetts, and BWC's faxing of the signed confidentiality agreement to FMI in Waltham. Any debate over the sufficiency of BWC's jurisdictional contacts with Massachusetts has been foreclosed by the First Circuit. See *Foster–Miller*, 46 F.3d at

145 ("BWC transacted business in Massachusetts to such an extent, and in such a manner, as to satisfy the minimum contacts requirement").

As to the second component of the test, that the claim "arise from" the contacts, Massachusetts has adopted a very liberal "but for" or "train of events" test. See *Tatro*, 416 Mass. at 769–771, 625 N.E.2d 549. Compare *Marino v. Hyatt Corp.*, 793 F.2d 427, 428–430 (1st Cir.1986). FMI asserts that its breach of contract claim arises directly from BWC's misuse of the proprietary information disclosed at the Waltham meeting. Although disputed, FMI has presented evidence that the constituents of its hose and the name of its vendor were proprietary to FMI. If, as alleged, BWC used this information in the development of its own hose, the "arising from" requirement of the test is met.

"[T]he exercise of personal jurisdiction over the defendant must [also] comport with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). In assessing whether an assertion of personal jurisdiction satisfies due process, a district court is directed to weigh certain so-called "gestalt" factors. These are: "(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiffs interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies." *United Elec. Workers*, 987 F.2d at 46.

With respect to the first factor, the choice of Massachusetts as a forum imposes only a slight hardship on the defendant. BWC is an established, profitable corporation represented by capable Massachusetts lawyers. The second factor, the forum state's interest in adjudicating the dispute, is not to be resolved by weighing the relative interests of competing jurisdictions in the outcome of the litigation (the mistake the district court made earlier), but by focussing exclusively on the interest of the forum state. *Foster–Miller*, 46 F.3d at 151. There is no doubt that Massachusetts has an interest in protecting the intellectual property of its citizens. In weighing the third factor, the plaintiff's inter-

est in convenient and effective relief, the First Circuit directs a district court to "accord plaintiffs choice of forum a degree of deference in respect to the issue of its own convenience." *Id.*, citing *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 211 (1st Cir.1994). As for the last two factors, the courts of both Canada and Massachusetts afford means of "effective resolution" of the case and share the same substantive concerns for the protection of property rights. In sum, an exercise of personal jurisdiction in this case will do no violence to notions of fair play and substantial justice.

*Dismissal on Grounds of Forum Non Conveniens*

■ BWC also seeks dismissal of the Complaint on grounds of forum non conveniens. Under this doctrine, the trial court has the discretion to dismiss any case where an alternative forum is available which is both fair and convenient to the parties and the courts. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255, 102 S.Ct. 252, 265, 70 L.Ed.2d 419 (1981); *Mercier v. Sheraton Intern., Inc.*, 981 F.2d 1345, 1349 (1st Cir.1992). As there is a strong presumption in favor of a plaintiffs choice of forum, the defendant bears "the burden of proving both the availability of an adequate alternative forum and the likelihood of serious unfairness to the parties in the absence of a transfer to the alternative forum." *Id.* (citations omitted).

In choosing a forum, the court first considers whether "the defendant who asserts forum non conveniens is amenable to process in the alternative forum." *Id.* There is no question that BWC is amenable to process in Canada. Adequacy of the forum also depends on the sufficiency of the remedy available to a plaintiff. It would appear that FMI could obtain the same, if not more complete relief, in Canada. Thus, the first inquiry yields a neutral result.

The court's second inquiry is whether the alternative forum is so much more convenient to one or both parties or to the respective judicial systems as to make transfer necessary to avoid serious unfairness. The court considers both "public interest" and "private interest" criteria. Public interest criteria focus on the practical difficulties of imposing on a busy court. Private interest criteria include the parties' ease of access to

sources of proof, the availability of compulsory process, the cost of securing the attendance of witnesses, and the other burdens of participating in a trial.

As instructed by the Supreme Court in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947), the plaintiffs choice of forum is to be disturbed only "rarely." As litigation in either forum offers no extraordinary advantage to one party or significant detriment to the other, or to either judicial system, a dismissal on grounds of forum non conveniens is not appropriate.

## ORDER

Defendant's Motion for Summary Judgment is *DENIED.* Defendant's Motion to Dismiss for Lack of Personal Jurisdiction or for Forum Non Conveniens is also *DENIED.* With discovery complete, this case will proceed to trial on October 6, 1997. The parties will receive an Order from the Clerk regarding trial procedures and shall appear for a final pretrial conference on Thursday, October 2, 1997 at 3:00 p.m.

SO ORDERED.