# United States Court of Appeals
## For the First Circuit

No. 00-2582

JOHN LARCH,

Plaintiff, Appellee,

v.

MANSFIELD MUNICIPAL ELECTRIC DEPARTMENT,

Defendant, Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Torruella, Circuit Judge,
Gibson,* Senior Circuit Judge,
and Lipez, Circuit Judge.

Leonard H. Kesten, with whom Deidre Brennan Regan and Brody,
Hardoon, Perkins & Kesten were on brief, for appellant.
Alan R. Hoffman, with whom Lynch, Brewer, Hoffman & Sands
LLP were on brief, for appellee.

December 3, 2001

* Hon. John R. Gibson, of the Eighth Circuit, sitting by
designation.

**LIPEZ, Circuit Judge**.  On February 2, 1998, the Board of Commissioners of the Mansfield Municipal Electric Department voted not to renew the contract of the Department's manager, John Larch.  Larch filed a complaint against the Department under Mass. Gen. Laws ch. 149, § 185(b) (the "Whistleblower Statute"), and 42 U.S.C. § 1983, alleging that his employment had been unlawfully terminated in retaliation for his refusal to obey Commissioner Frank Colella's order that he hire Michael Forbes, a friend of Colella's, as an apprentice lineman/meter reader or meter reader.  The case went to trial, and the jury returned a verdict for Larch on the Whistleblower claim, awarding damages in the amount of $607,977.00. The court added attorney's fees, costs, and prejudgment interest.  The Department appeals on numerous grounds.  We affirm.

## I. Background

From March of 1983 to June 30, 1998, John Larch was manager of the Mansfield Municipal Electric Department (the "Department" or the "Electric Department"), where he was in charge of the day-to-day operation of the Department, including the hiring and discharge of employees.  The Board of Selectmen, who under the town charter were also the Electric Department's Board of Commissioners (the "Board"), were responsible for setting Electric Department policy.  The three Board members who

voted not to renew Larch's contract in February of 1998 were Frank Gerald Colella, Norman Mahana, and William C. Madan. Madan and Mahana were elected to the Board in March of 1996; Colella had been elected the previous year. Larch accused these three Commissioners of acting in concert to retaliate against him for his decision not to hire Forbes. The two Commissioners who opposed the motion not to renew Larch's contract were Amos M. Robinson and Dianne Royle (who replaced Joseph M. Pasquale on the Board in 1997).

In March of 1998, Larch filed a complaint in Bristol County Superior Court against defendants Madan, Royle, Colella, Mahana, and Robinson, as members of the Mansfield Municipal Electric Department Board of Commissioners, alleging that the Board's decision not to renew his contract violated the Massachusetts Whistleblower Statute, Mass. Gen. Laws ch. 149, § 185(b), because it was in retaliation for his refusal to perform an act (hire Forbes) that he reasonably believed would have been unlawful. Larch claimed that it would have been unlawful to hire Forbes because under Massachusetts law the "manager of municipal lighting" shall have "full charge" of "the employment of . . . agents and servants," Mass. Gen. Laws ch. 164, § 56, and because under the collective bargaining agreement a union member who expressed interest in the position had

-3-

priority over Forbes. The complaint also alleged breach of contract and unlawful discharge, and sought declaratory relief. Larch filed an amended complaint in April of 1998, adding as defendants Madan, Colella, and Mahana as individuals, and the Mansfield Municipal Electric Department, and adding a federal civil rights claim under 42 U.S.C. § 1983. In May of 1998 the case was removed to the United States District Court for the District of Massachusetts. In March of 1999 a suggestion of death was filed as to Mahana.

The central issue at trial, which commenced on June 26, 2000, was whether the Board's decision not to renew Larch's contract was in retaliation for Larch's decision not to hire Forbes. Larch's theory of the case was that Colella had ordered him to hire Forbes, and that when he refused to do so in June of 1996, a majority on the Board (Colella, Madan, and Mahana) launched a protracted campaign of harassment against him that culminated in February of 1998 with the vote not to renew his contract. The Board argued that Colella never ordered Larch to hire Forbes, but simply recommended him for the position, and that the non-renewal decision was unrelated to the Forbes affair.

During the trial, the court dismissed the claims against the individual defendants, directed a verdict for the

-4-

Department on the civil rights claim, and directed a verdict for Larch on the breach of contract claim (with nominal damages).[1] The Whistleblower claim went to the jury, which on July 5, 2000, returned a verdict for Larch in the amount of $607,977.00. In a subsequent order the district court awarded prejudgment interest from March 9, 1998, and attorney's fees and costs pursuant to the Whistleblower Statute.

The Department then moved for judgment as a matter of law, for a new trial, and to alter or amend the judgment. It argued that there was insufficient evidence that Larch reasonably believed that hiring Forbes would have violated the law; that there was insufficient evidence that his refusal to hire Forbes was a substantial or motivating factor in the Board's decision not to renew his contract; that the non-renewal of Larch's contract was not a "retaliatory action" within the meaning the Whistleblower Statute; that the district court erred in admitting into evidence the statements of the deceased Commissioner Mahana; and that the award of damages was too speculative and should be reduced. The district court denied these motions. The Department also moved for reconsideration of

---

[1] The district court found that the Department had breached its contract with Larch when it unilaterally reduced the threshold at which purchase orders required Board approval from $10,000 (the figure in the contract) to $1,000. Larch requested only nominal damages.

-5-

the court's order concerning attorney's fees and prejudgment interest.  The court granted these motions in part, adjusting the date from which prejudgment interest would be awarded and authorizing certain deductions from the attorney's fees award. The court entered an amended judgment on October 20, 2000, awarding Larch $607,977.00, plus prejudgment interest in the amount of $168,498.84, attorney's fees in the amount of $119,265.00, and costs of $8,523.00.  The Department filed a notice of appeal on November 16, 2000.

## II. Sufficiency of the Evidence

Larch claims, and the jury found, that the Department violated the Massachusetts Whistleblower Statute, Mass. Gen. Laws ch. 149, § 185(b), which provides, in relevant part:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
> . . .
> (3) Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment.

The district court instructed the jury that Larch had to prove (1) "that he objected to or refused to participate in an activity, policy or practice that he reasonably believed was in

violation of a law, rule or regulation;" (2) "that his refusal to participate in the activity played a substantial or motivating part in the decision not to renew his contract"; and (3) "that the retaliatory action caused him damages."  The Department argues that there was insufficient evidence for the jury to make findings one and two.

"We review the district court's denial of [a] motion for judgment as a matter of law de novo, viewing the evidence in the light most favorable to [the non-moving party] and drawing all reasonable inferences in its favor.  Our inquiry is whether the evidence, when viewed from this perspective, would permit a reasonable jury to find in favor of [the non-moving party] on any permissible claim or theory."  Foster-Miller, Inc. v. Babcock & Wilcox Canada, 210 F.3d 1, 7 (1st Cir. 2000) (citations and internal quotation marks omitted).  We conclude that the evidence was sufficient to support the jury's verdict.

**(a) Reasonable Belief That Hiring Forbes Would Have Been Unlawful**

Larch testified that he reasonably believed that hiring Forbes pursuant to Colella's order would have violated three Massachusetts statutes.  Because Larch only had to establish that he reasonably believed that hiring Forbes would have

violated one of the statutes he cited,[2] we limit our discussion to Mass. Gen. Laws ch. 164, § 56, which provides that the "manager of municipal lighting" shall have "full charge" of "the employment of . . . agents and servants."[3]  Larch argues that hiring Forbes pursuant to Colella's order would have entailed an unlawful substitution of Colella's judgment for his own.  The Department asserts that Colella never ordered Larch to hire Forbes, but simply recommended Forbes for the positions.

There was ample evidence at trial to support a jury finding that Colella had ordered Larch to hire Forbes.  On March 5, 1996, the Board voted to authorize a new position for an

---

[2]  The other statutes Larch cited are Mass. Gen. Laws ch. 268A, § 23(b)(2) (government employees shall not use their official position to secure, for themselves or for others, "unwarranted privileges . . . of substantial value . . . which are not properly available to similarly situated individuals"); and Mass. Gen. Laws  ch. 150E, § 7(d) (terms of collective bargaining agreement shall prevail over municipal personnel ordinances, by-laws, rules, or regulations).

[3]  Mass. Gen. Laws ch. 164, § 56 reads, in relevant part:

The mayor of a city, or the selectmen or municipal light board, if any, of a town acquiring a gas or electric plant shall appoint a manager of municipal lighting who shall, under the direction and control of the mayor, selectmen or municipal light board, if any, and subject to this chapter, have full charge of the operation and management of the plant, the manufacture and distribution of gas or electricity, the purchase of supplies, the employment of attorneys and of agents and servants, the method, time, price, quantity and quality of the supply, the collection of bills, and the keeping of accounts.

apprentice lineman/meter reader.  Between March 5 and June 3, 1996, Colella indicated to Larch on at least three occasions that he expected Forbes, a friend and co-worker of Colella's, to be hired for the new position.  While it was common for Commissioners to recommend people for open positions, Larch testified that he believed Colella was ordering him to hire Forbes.  Larch testified that he had decided not to hire Forbes "as long as [Colella] was telling me to hire him."

Larch did not post the new position when it was authorized, believing that "we were going to have a problem" when Colella found out that Forbes was not getting the job.  At the beginning of June, however, Larch learned that Shawn Curran, a meter reader in the Department, had decided to bid for the position.  Larch believed that Curran's bid would get him "off the hook" with Colella because the union contract stipulated that members of the bargaining unit had absolute preference for open positions.  After the June 3 Board meeting, he informed Colella that the new position would go to Curran.  Colella testified that he was upset by this news.

The next day, Colella indicated to Kym Gaissl, the Department's Business Manager, that the Selectmen/Commissioners were the "town fathers," a phrase which, Gaissl testified, the Commissioners often used to indicate "that they had the right to

tell people what to do and how to do it."  On June 6, Mahana told Gaissl that Colella was "very upset" about Forbes not getting the job, and declared: "We are the town fathers and people should do what we tell them to do."  The jury could reasonably have taken these statements as evidence of an order rather than a recommendation.

Around June 14, Colella delivered a second job application from Forbes to Gaissl, this time for either the apprentice lineman/meter reader position, or the meter reader position which would open up if Curran was hired into the new position.  On June 18, Colella indicated to Larch that "he was one of the town fathers and the town fathers had the right to have who they wanted to hire hired."  Larch decided, however, that there was not enough work to justify filling the meter reader position.  Colella was angry and disappointed when he heard this news.  Just before the June 26 meeting of the Board, Mahana said to Larch that he and Gaissl had upset Colella, and that "he or they were going to make our lives miserable until we made [Colella] happy again."  The jury could reasonably have concluded that the persistent criticism of and interference with Larch's management of the Department after his decision not to hire Forbes (see infra) was evidence that Larch had disobeyed an order rather than merely neglecting to adopt a recommendation.

The Department offered evidence that Larch had a longstanding policy of granting an interview to any job candidate a Board member recommended, and that he had sometimes hired such candidates in the past. The court's instruction to the jury made clear the Board's "recommendation" theory: "the statute does not prohibit job recommendations by a selectman or commissioner. It is up to you to decide whether the statement or statements made by selectmen were orders to hire Mr. Forbes or recommendations." Since the court properly framed the issue for the jury, a rejection of the Department's "recommendation" theory is implicit in the jury's verdict for Larch.

Even if Colella did order Larch to hire Forbes, the Department argues that Larch could not have reasonably believed that hiring Forbes pursuant to Colella's order would have violated Mass. Gen. Laws ch. 164, § 56, because the statute bars <u>the Board</u>, not individual Board members, from interfering with the manager's power to hire and discharge employees. The Department cites <u>Golubek</u> v. <u>Westfield Gas & Electric Light Board</u>, 591 N.E.2d 682, 683 (Mass. App. Ct. 1992), for the proposition that Mass. Gen. Laws ch. 164, § 56 is not violated unless a <u>board</u> action infringes on the prerogatives of the manager. <u>Golubek</u> does not, however, support that reading of the statute. It is simply a case where an action by the board

-11-

was found to have violated the statute. Golubek states that under § 56 the hiring power is "vested in the manager alone." Id. at 684 (emphasis added). The town's own counsel, moreover, advised the Board on September 4, 1997, that "[t]he [Electric] Department manager has exclusive authority to hire and discharge employees."[4] In light of Golubek, the opinion of town counsel, and the plain language of the statute (manager of municipal lighting shall have "full charge" of hiring employees), the jury could have found that Larch reasonably believed that to hire Forbes at Colella's direction would have violated Mass. Gen. Laws ch. 164, § 56.[5]

The Department suggests that Larch's failure to tell Colella that it would be illegal to hire Forbes pursuant to his order indicates that Larch did not believe he was being asked to do anything illegal. The jury could have found, however, that Larch kept this belief to himself to avoid a confrontation with Colella.

---

[4] Although this opinion post-dates the Forbes episode, it is evidence of the reasonableness of Larch's interpretation of the statute.

[5] Since a reasonable belief that hiring Forbes upon Colella's order is enough to establish a violation of the statute, we do not have to decide whether Colella's conduct in fact violated § 56.

-12-

**(b) Substantial or Motivating Factor in the Decision Not to Renew**

The Department argues that there was insufficient evidence that Larch's decision not to hire Forbes was a substantial or motivating factor in the decision not to renew his contract. Viewing the evidence in the light most favorable to Larch, and drawing reasonable inferences in Larch's favor, there is ample evidence to support a jury finding that the Board made its non-renewal decision in retaliation for Larch's refusal to hire Forbes. See Foster-Miller, 210 F.3d at 7.

On June 4, 1996, the day after Colella learned that Forbes would not be getting the apprentice lineman/meter reader position, Colella called Gaissl and said that he wanted to cancel the purchase of a backhoe for the Department which the Board had approved unanimously at the June 3 meeting. Colella said to Gaissl: "John's done it to me again, he's not going to hire this kid. . . . I'm looking like an idiot. . . . I'm really, really mad." That same day, Colella told Gary D'Ambra, an Electric Department employee, that he was upset and frustrated that Larch had decided not to hire Forbes, and that he was "all done with John Larch." On June 6 Mahana, who was often seen passing time with Colella and Madan at a local pub and outside a local ice cream store, told Gaissl that Colella

-13-

was "very upset" about Forbes not getting the job. An "extremely irate" Mahana communicated with Gaissl again on June 10, telling her that "he didn't know who the hell John Larch thought he was, but he'd been doing it his way for a long time and that wasn't going to happen anymore . . . that he would kick his ass out of town and . . . make life miserable for the department." Mahana told Gaissl that he would take away the backhoe, take away Larch's car allowance, relocate the office staff, and stop all overtime in the Department.

Larch, Gaissl, and Commissioner Pasquale testified that, in contrast to previous Board meetings, which had been professional and businesslike, the tone of the June 26 Board meeting was hostile and antagonistic toward Larch. Most of the meeting was devoted to Colella, Mahana and Madan grilling Larch about alleged problems in the Department. Colella questioned Larch about provisions in his contract providing for life insurance and a vehicle for his official use, and moved to reverse the Board's earlier decision to purchase a backhoe for the Department. Mahana interrogated Larch about the Department's longstanding practice of making payments to the Town, suggested that the Department should be moved out of its office condominium, criticized Larch for generating too much revenue, questioned the granting of preferential electric rates

to the high school, and mentioned ("I just want the public to know") a debt the Department owed. Madan then questioned Larch about alleged electrical problems in the industrial park.

In subsequent meetings, the Board continued to undercut Larch's authority to run the Department. On October 7, 1996, the Board voted to require its approval for contracts with outside consultants and purchase orders over $1,000, and to put the Department's non-union employees under the Town's personnel policy. On November 4, 1996, Madan and Colella suggested that too many Department employees had cell phones and beepers, and Colella said he wanted the number of cell phones reduced to three. On April 2, 1997, Madan questioned the Department's provision of bottled water to its employees.

On May 5, 1997, the Board denied Larch's request that an employee who was performing two jobs at the same time receive a wage increase of $2 per hour, and voted to have the Town's accountant do the Department's books. On May 15, 1997, the Board encouraged a Department employee to appeal an adverse personnel decision to the Town Manager. On June 2, 1997, Colella declared that he was "very upset" that two Department employees had been denied vacation time (because other employees had requested the same dates), and indicated that the Board should make final decisions concerning vacation time in the

Department.  On September 29, 1997, the Board voted to eliminate all scheduled overtime in the Department, except with the approval of the Chairman of the Board.  On January 12, 1998, Madan criticized Larch for letting Department employees go home early on December 24.

On February 2, 1998, the Board voted not to renew Larch's contract.  At the meeting, Madan explained simply that there had been "a lot of mismanagement" in the Electric Department.  Although Madan was more specific at trial about the reasons for not renewing Larch's contract, there was evidence that the explanations were pretextual.  Madan pointed to the Department's lack of a personnel policy, but there was evidence that the Department used the Town's personnel policy, with a few exceptions, and that the Board knew of this practice.  Madan cited outages in the industrial park, but there was evidence that these problems were minor.  Madan testified that the Board was concerned about the Department's finances, but there was evidence that the Department had substantial accumulated profits ($8,000,000 as of April 1997), that relatively modest losses in 1996 and 1997 were due to a rate cut designed to reduce the Department's profits and to unexpected events, and that a 1997 financial audit stated that "the Department is in good financial shape and is managed well."  Madan cited an employee's theft of

-16-

$500 from the Department, but there was evidence that the detection of this small theft indicated that the theft-detection system was functioning as it should. Madan also criticized Larch's handling of a hostile work environment claim by an employee, Rose McCarthy, against Business Manager Gaissl, but Larch testified that the Town's labor counsel had indicated that some of the incidents were too far back in time to act on, and had recommended that Larch await the results of McCarthy's litigation against the Department before deciding how to proceed.

In sum, the jury could reasonably have concluded that the persistent criticism of Larch's management of the Department, starting with the June 26, 1996, meeting and culminating with the non-renewal decision on February 2, 1998, amounted to the Board majority making good on the threat, issued at the time of Larch's decision not to hire Forbes, to "make life miserable for the department" and "kick [Larch's] ass out of town," and that the reasons the Department offered for not renewing Larch's contract were pretextual.

### III. Non-Renewal as Retaliatory Action

The Department argues that the decision not to renew Larch's contract does not constitute the "retaliatory action" proscribed by the Whistleblower Statute. Mass. Gen. Laws ch.

149, § 185(b). The statute defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." Id., § 185(a)(5). The Department argues that non-renewal of an employment contract does not fall under the statutory definition.

The Department has waived this argument, which first appeared in its renewed motion for judgment as a matter of law:

> A renewed motion for judgment as a matter of law under Rule 50(b), like the similar motion made under Rule 50(a) before the submission of the case to the jury, must state the grounds on which it was made. Since the post-submission motion is nothing more than a renewal of the earlier motion made at the close of the presentation of the evidence, it cannot assert a ground that was not included in the earlier motion.

9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2537, at 344-45 (2d ed. 1994) (footnotes omitted); accord Correa v. Hospital San Francisco, 69 F.3d 1184, 1196 (1st Cir. 1995) ("The movant cannot use [a renewed motion for judgment as a matter of law] as a vehicle to introduce a legal theory not distinctly articulated in its close-of-evidence motion for a directed verdict."). The Department rightly points out that "whether there had been retaliation" was a central issue at trial, but neglects to mention that until the

-18-

Department's post-verdict motion it had played out as a <u>factual</u> issue, not a legal one.  We also note that the Department failed to object to the jury instruction on retaliation, which stated: "A decision not to renew an employment contract is an adverse employment action under the statute."  In failing to bring its contrary reading of the statute to the court's attention until after the verdict had been rendered, the Department waived the argument it now seeks to advance.

## IV. Admission of Mahana's Statements

The Department argues that the district court erred in admitting the statements of the deceased Commissioner Mahana, such as "[w]e are the town fathers and people should do what we tell them to do," and that "he would kick [Larch's] ass out of town and . . . make life miserable for the department."  The district court admitted Mahana's statements as admissions of the Department, pursuant to Fed. R. Evid. 801(d)(2)(D), which excludes from the hearsay rule statements offered against a party and made "by the party's agent or servant concerning a matter within the scope of the agency or employment, . . . during the existence of the relationship."  The Department argues that Mahana's statements do not qualify as nonhearsay under Rule 801(d)(2)(D) because threatening the manager of the Electric Department in this fashion was not within the scope of

his employment.  It points out that the statements were neither authorized by the Department nor made for the purpose of furthering its interests.

We review a district court's admission of evidence for abuse of discretion.  See United States v. Gilbert, 181 F.3d 152, 160 (1st Cir. 1999).  There was no abuse of discretion here:

> To qualify as nonhearsay under Rule 801(d)(2)(D), a statement must concern "a matter within the scope" of the declarant's agency or employment.  The statement itself is not required to be "within the scope of the declarant's agency.  Rather, it need only be shown that the statement be related to a matter within the scope of the agency."

5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 801.33[2][c], at 801-69 (2d ed. 2001) (footnotes omitted).  While Mahana's job description obviously did not include making life miserable for the Electric Department, the statements were related to a matter within the scope of his employment: oversight of the Department.  See White v. Honeywell, Inc., 141 F.3d 1270, 1276 (8th Cir. 1998) (supervisor's racial slur against employee admissible against employer as statement "concerning a matter within the scope of the employment" under Fed. R. Evid. 801(d)(2)(D)).  The district court properly admitted Mahana's statements as nonhearsay under Rule 801(d)(2)(D).

-20-

## V. The Sexual Harassment Evidence

The Department argues that the district court erred in excluding certain details of the sexual harassment allegations against Business Manager Gaissl that Madan cited as a reason for not renewing Larch's contract. The excluded testimony was that Department employees had discussed the smell of semen. Although the court admitted testimony about other alleged sexually-charged conduct at the Department, it concluded that the testimony it decided to exclude would be "just too much for a jury." The Department also argues that it should have been permitted to ask Gaissl if she was personally involved in the alleged incidents, and to ask Larch whether Gaissl had acknowledged the truth of some of the allegations.

We review the district court's exclusion of evidence under Fed. R. Evid. 403 for abuse of discretion.[6] See United States v. Reeder, 170 F.3d 93, 107 (1st Cir. 1999). "'[O]nly rarely - and in extraordinary circumstances - will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative

---

[6] Federal Rule of Evidence 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

value and unfair effect.'"  Id. (quoting Williams v. Drake, 146 F.3d 44, 47 (1st Cir. 1998) (alteration in original)).

The district court admitted the evidence of sexual harassment for the limited purpose of permitting the Department to establish the factors that influenced the Board's decision not to renew Larch's contract.  The court weighed the probative value of the evidence against the potential for unfair prejudice, and let in almost all of the sexual harassment allegations.  It declined to let the Department inquire into Gaissl's personal involvement in the incidents, on the ground that "we're not going to have mini trials on each one of those allegations."  There was no abuse of discretion in the court's decision not to conduct a "mini trial" on the issue of sexual harassment, or in its exclusion of some limited testimony on that issue that it believed would be unduly prejudicial to Larch.  Indeed, the argument to the contrary is frivolous.

## VI. Excessive Damages

The Department argues that it was error to award damages based on the assumption that Larch's contract would be renewed until he reached the age of 65.  It noted that Larch had worked under a series of two- and three-year contracts, which the Board could elect not to renew with or without cause.  The

Department therefore suggests that the proper measure of damages would be one additional employment contract.

We review the district court's decision not to reduce the jury's award of damages for abuse of discretion. <u>Blinzler</u> v. <u>Marriott Int'l, Inc.</u>, 81 F.3d 1148, 1161 (1st Cir. 1996). "An award of damages will not be deemed unreasonably high . . . as long as it comports with some rational appraisal or estimate of the damages that could be based on the evidence before the jury," and is not "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." <u>Id.</u> (citations and internal quotation marks omitted).

The Department argues that the award of damages beyond the period of one additional employment contract should be overturned because it was "necessarily speculative." However, the Supreme Judicial Court of Massachusetts ("SJC") has stated that "the law of the Commonwealth has traditionally allowed, as an element of tort damages, compensation for the loss of capacity to generate prospective earnings. Mere uncertainty in the award of damages is not a bar to their recovery . . . ." <u>Conway</u> v. <u>Electro Switch Corp.</u>, 523 N.E.2d 255, 257 (Mass. 1988) (citation and footnote omitted) (interpreting the Massachusetts employment discrimination statute). This principle applies

-23-

under the Whistleblower Statute, which provides that "[a]ll remedies available in common law tort actions shall be available to prevailing plaintiffs."  Mass. Gen. Laws ch. 149, § 185(d).

In Kelley v. Airborne Freight Corp., 140 F.3d 335 (1st Cir. 1998), we upheld an award of $1,000,000 in front pay damages under the Massachusetts employment discrimination statute, Mass. Gen. Laws ch. 151B, § 9.  We explained:

> An award of front pay, constituting as it does, an estimate of what a plaintiff might have earned had s/he been reinstated at the conclusion of trial, is necessarily speculative.  Massachusetts law is clear that uncertainty in the award of future damages does not bar their recovery, and we have said that the generousness of a jury's award does not alone justify an appellate court in setting it aside [unless] it is shown to exceed any rational appraisal or estimate of the damages.

Id. at 355 (citations and internal quotation marks omitted); see also Cummings v. The Standard Register Co., 265 F.3d 56 (1st Cir. 2001) (upholding an award of 14 years of front pay under Massachusetts law).

Although the SJC in Conway cautioned that "damages may not be determined by speculation or guess," 523 N.E.2d at 257, the jury's award of $607,977 in compensatory damages was based on evidence presented at trial.  Larch was 55 years old when his employment terminated in June of 1998.  He had served as manager of the Electric Department for 15 years under a series of two-

and three-year contracts.  The last three contracts contained a clause that would automatically renew the contract for an additional two- or three-year term unless the Board gave notice of non-renewal within four months of the contract's end.  Larch testified that he had intended to work at the Electric Department until he reached the age of 65.

Larch had received positive evaluations of his job performance in December of 1993 and January of 1995. Commissioner Pasquale testified that he had rated Larch "above average" in most categories.  Commissioner Royle also testified that Larch had been performing well.  Larch testified that his efforts to obtain new employment during the time between his termination and the trial (he cited specific positions for which he had applied) had been unsuccessful.  He testified that because of deregulation, utilities were laying off employees rather than hiring, and that the current phase of deregulation would continue for 10 years.

There was also evidence that the non-renewal of Larch's contract and Madan's charge of "a lot of mismanagement" in the Department were reported in the local media.  Pasquale, a human resources professional, testified that prospective employers would likely take into account the allegations of mismanagement surrounding the termination of Larch's tenure at the Department.

Based on this evidence, a reasonable jury could have found, as this jury did, that Larch's damages amounted to the discounted value of the benefits and compensation he would have received if he had worked until age 65, less the discounted value of the pension payments he would receive because of his termination.[7] There is nothing "grossly excessive" or "shocking to the conscience" about this calculation of Larch's damages. Blinzler, 81 F.3d at 1161.

## VII. Attorney's Fees

We review an award of attorney's fees for abuse of discretion. Coutin v. Young & Rubicam Puerto Rico, Inc., 124 F.3d 331, 336 (1st Cir. 1997). The Department argues that the district court erred in awarding Larch attorney's fees because the court, in an order explaining its decision not to award Larch multiple damages, observed that "[t]his case did not involve invidious discrimination, corruption, or self-dealing, but misguided cronyism involving a commissioner with a 'big heart.'" The Department reasons that since the court declined to award multiple damages on this basis, it should also have declined to award attorney's fees.

The Massachusetts Whistleblower Statute provides that "[t]he court may . . . order payment by the employer of

---

[7] An actuary estimated these figures for the jury at trial.

-26-

reasonable costs, and attorneys' fees."  Mass. Gen. Laws ch. 149, § 185(d)(5).  As the statute confers broad power to award attorney's fees, without setting forth criteria for deciding when to award them, and its evident purpose is to protect employees who are found to have been subject to retaliation for refusing to engage in unlawful conduct, as was Larch, we have no basis for questioning the district court's exercise of its discretion to award attorney's fees in this case.

## VIII.  Prejudgment Interest

The Department argues that the district court erred in awarding Larch pre-judgment interest on "the entire amount" of the damages award.[8]  The Department has waived this argument. Subsequent to the jury's verdict for Larch, the district court issued an order stating that, "having received no opposition to the plaintiff's letter . . . which outlines the plaintiff's understanding regarding interest on the judgment," the court was awarding Larch prejudgment interest on the entire amount of the judgment at a rate of 12%, from the date the complaint was filed (March 9, 1998).  The Department then filed a motion for reconsideration of the district court's order, asserting that prejudgment interest should have been awarded not from the date

---

[8]  The Department does not make clear what alternative it proposes to prejudgment interest on "the entire amount" of the award.

of the complaint, but from the date plaintiff first sustained damages (June 30, 1998, the final day of his employment at the Department).  The district court granted this motion, and the parties then stipulated that prejudgment interest would run from June 30, 1998.[9]

The Department's argument on appeal, that the court erred in awarding prejudgment interest on the entire amount of Larch's damages, was never raised below.  In Eastern Mountain Platform Tennis, Inc. v. The Sherwin-Williams Co., Inc., 40 F.3d 492 (1st Cir. 1994), the defendant argued on appeal that prejudgment interest should not have been awarded on future lost profits.  We held that the defendant had waived the argument because it had not made the argument before the trial court. See id. at 504.  "The law in this circuit is crystalline: a litigant's failure to explicitly raise an issue before the district court forecloses that party from raising the issue for the first time on appeal." Boston Beer Co. Ltd. P'ship v. Slesar Bros. Brewing Co., Inc., 9 F.3d 175, 180 (1st Cir. 1993).

**Affirmed.**

---

[9]  The stipulation reads: "The parties have agreed to resolve their outstanding dispute regarding the prejudgment interest and now stipulate that the Court should award prejudgment interest calculated from June 30, 1998, up to and including the date of said amended judgment."