# United States Court of Appeals
## For the First Circuit

Nos. 01-1092
     01-1093
     01-2125

PAUL WENNIK,

Plaintiff, Appellee/Cross-Appellant,

v.

POLYGRAM GROUP DISTRIBUTION, INC.,

Defendant, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Boudin, Chief Judge,
Bownes, Senior Circuit Judge,
and Selya, Circuit Judge.

Craig R. Benson, with whom James P. Clark, Rains & Pogrebin, P.C., Ann Pauly, and Richmond, Pauly & Ault LLP, were on brief, for defendant.
Harold L. Lichten, with whom Betsy Ehrenberg, Shannon Liss-Riordan, and Pyle, Rome, Lichten & Ehrenberg, P.C., were on brief, for plaintiff.

September 10, 2002

**BOWNES**, **Senior Circuit Judge**. Plaintiff-appellee/cross-appellant Paul Wennik brought suit against his former employer, defendant-appellant/cross-appellee PolyGram Group Distribution, Inc., alleging age and mental handicap discrimination and retaliation in violation of Mass. Gen. Laws ch. 151B.[1] A jury found for Wennik on the handicap discrimination claim and for PolyGram on the age discrimination claim. PolyGram appeals the handicap discrimination verdict and the district court's award of attorneys' fees. Wennik cross-appeals on the age discrimination verdict. We **AFFIRM** the verdict on both the age and handicap discrimination claims and **REMAND** to the district court on the issue of attorneys' fees.

## I. BACKGROUND

### A. Procedural History

Wennik brought suit against PolyGram in state court in Massachusetts, alleging handicap and age discrimination and retaliation in violation of Mass. Gen. Laws ch. 151B. The case was

---

[1]In relevant part, Chapter 151B, §4(1B) makes it unlawful for an employer "because of the age of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual . . . unless based upon a bona fide occupational qualification." Chapter 151B, §4(16) states that it is unlawful for an employer "to dismiss . . . refuse to hire, rehire or advance in employment or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person . . . unless the employer can demonstrate that . . . accommodation . . . would impose an undue hardship to the employer's business." The retaliation portion of the statute is not at issue in these appeals.

removed to federal court on the basis of diversity jurisdiction. At the close of Wennik's case, PolyGram moved for judgment as a matter of law on all Wennik's claims pursuant to Rule 50 of the Federal Rules of Civil Procedure. The district court reserved decision on the motion, and PolyGram renewed the motion at the close of all the evidence. The district court granted the motion in part, but allowed the age and handicap claims related to the field marketing manager position to go to the jury.[2] The jury returned a verdict in favor of Wennik on the handicap discrimination claim, awarding $323,000 in back pay, $60,000 in damages for emotional distress, and $21,000 in punitive damages. The jury found in favor of PolyGram on the age discrimination claim. After entry of the judgment,[3] PolyGram again moved for a directed verdict pursuant to Rule 50, and the district court again denied the motion. The district court awarded attorneys' fees of $397,328.15 and costs of $8,961.91 to plaintiff.

Following entry of the judgment, the district court denied Wennik's motion to alter or amend the judgment so as to enter judgment on his age discrimination claim.[4]

---

[2]The court granted the motion with respect to other positions within the company.

[3]The docket indicates that judgment was signed on November 2, 2000, but that the entry date was November 7, 2000.

[4]Wennik's motion also asked the court to multiply the damages by a factor of at least two but no greater than three, pursuant to Mass. Gen. L. ch. 151B, § 9.

**B.   Facts**

We recite the facts as the jury might have found them, consistent with the record, but in the light most favorable to the verdict. See Grajales-Romero v. Am. Airlines, Inc., 194 F.3d 288, 292 (1st Cir. 1999); Sinai v. New Eng. Tel. & Tel. Co., 3 F.3d 471, 472 (1st Cir. 1993).

From 1975 to 1996, Wennik worked for PolyGram as branch manager of the company's northeast branch, based in Woburn, Massachusetts. From October 1995 until May 1996, Wennik took a medical leave of absence due to depression and anxiety disorder, a psychiatric disability that is the basis for his mental handicap claim. Just before his leave, in October 1995, Wennik met with PolyGram's president and CEO, James Caparro, at which time Caparro asked Wennik several times if he wished to retire. Wennik said this was not a viable option for him financially. Wennik returned to work in May 1996 and continued to serve as branch manager for the northeast until August 1, 1996. On that day, PolyGram announced that it was eliminating all nine of its branch manager positions as part of a company-wide reorganization and creating four regional director positions in their place.

As a result of the reorganization, Wennik's position as northeast branch manager was eliminated. At fifty-nine years of age, Wennik was the oldest of the nine branch managers. He expressed support for the reorganization plan and stated his

willingness to consider retiring. He attempted to negotiate a greater severance package than what PolyGram was offering, but the company was unwilling to provide this.

After the reorganization, seven of the nine branch managers were given new positions within the company without having to formally apply. Only Wennik and one other branch manager, who left PolyGram for a job with another company, were not given new positions. Instead, PolyGram encouraged Wennik to interview for the newly-created field marketing manager position based in the New York regional office.

In August 1996, Wennik interviewed for this position with Ron DiMatteo, the newly-appointed northeast regional director. Prior to his interview, Wennik inquired about the possibility that the position be based in Boston, but DiMatteo informed him this was not an option. During the interview, Wennik expressed concerns about relocating to New York and again inquired about performing the job while living in Boston. DiMatteo again informed him that the company was unwilling to consider such an arrangement. At the interview, Wennik asked DiMatteo to put the issue of relocation aside and instead tell him whether he was a good candidate for the job, at which point he would be able to discuss the issue with his wife. At another point, however, Wennik claimed he told DiMatteo during the interview that he had already discussed the issue with his wife and was willing to relocate. In his post-interview notes,

DiMatteo indicated that the issue of relocation was left "undetermined."

During this interview, DiMatteo expressed surprise that Wennik was applying for the position, stating "When I get over 55, there's no way you'll find me in this business." Although Wennik's prior leave of absence was not mentioned in the interview, DiMatteo was aware that Wennik had taken such a leave. In addition, others in the company headquarters knew of Wennik's medical condition.

At the conclusion of the interview, DiMatteo told Wennik that he would continue interviewing candidates for the position and that Wennik should contact him if he was willing to relocate. Wennik did not follow up further with either DiMatteo or any other company executives about the position. The position was ultimately offered to and accepted by Kevin Mangini, a twenty-seven year-old former PolyGram employee, whom DiMatteo had interviewed in November 1996.

## II. DISCUSSION

### A. Handicap Discrimination Claim

PolyGram argues that the trial court erred in denying its motion for judgment as a matter of law on the handicap claim because: (1) the decision-maker had no knowledge of the handicap and therefore could not have discriminated against Wennik based upon it; (2) the jury's verdict for PolyGram on the age discrimination claim precludes a finding that PolyGram's

-6-

articulated reasons were pretext for handicap discrimination; and (3) the evidence was insufficient for a finding that Wennik's handicap was the real reason he was not selected for the field marketing manager position.

This court reviews a district court's denial of a motion for judgment as a matter of law de novo, "viewing the evidence in the light most favorable to [the non-moving party] and drawing all reasonable inferences in its favor.  Our inquiry is whether the evidence, when viewed from this perspective, would permit a reasonable jury to find in favor of [the non-moving party] on any permissible claim or theory." Larch v. Mansfield Mun. Elec. Dep't, 272 F.3d 63, 67 (1st Cir. 2001) (alteration in original) (citation and internal quotation marks omitted).  We conclude that a reasonable jury could have found in favor of Wennik.  Therefore, the district court did not err in denying PolyGram's motion.

We recite the legal framework for a handicap discrimination claim under Massachusetts law where, as here, direct evidence of discrimination is absent.  The employee must first establish a prima facie case of discrimination by showing he is a member of a protected class, performed his job at an acceptable level, was terminated, and the employer nonetheless sought to fill his job by hiring another individual with similar qualifications. Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 116 (2000).  This showing creates a presumption of discrimination,

which the employer can rebut by articulating a lawful reason or reasons for its decision and producing credible evidence to show the reasons advanced were the real reasons. Id. at 116-17. The employer need not prove that the reasons were nondiscriminatory but "retains an incentive to persuade the trier of fact that the employment decision was lawful." Id. at 117 (internal citation and quotation marks omitted). If the employer fails to meet this burden of production, the plaintiff is entitled to judgment. Id. If the employer meets its burden, the burden shifts back to the employee to show that the basis for the employer's decision was unlawful discrimination. Id.

PolyGram's first argument is that Ron DiMatteo, the individual responsible for hiring the field marketing manager, had no knowledge of Wennik's handicap at the time he made the decision not to hire him; therefore, Wennik could not have been a victim of discrimination "because of his handicap," Mass. Gen. Laws ch. 151B, § 4(16). After reviewing the record, we conclude that the evidence was sufficient for a reasonable jury to determine that DiMatteo was not the sole decision-maker and/or that he knew of Wennik's handicap.

PolyGram argues that DiMatteo was solely responsible for hiring someone to fill Wennik's position, and that other witnesses corroborated this assertion. Although John Madison, Wennik's supervisor and PolyGram's executive vice president, was required to

sign off on DiMatteo's selection, PolyGram argues that it was undisputed that DiMatteo bore the sole responsibility for selecting a candidate to submit to Madison, and that Wennik's name was not submitted.

The jury heard evidence from which it could infer that DiMatteo was not the sole decision-maker in filling the New York field marketing position, but that this decision was made at a higher level in the company. Wennik presented evidence that all the field marketing positions except that for the New York region had been "slotted in;" that is, these positions were filled with pre-selected candidates before the announcement of the reorganization plan within the company. Paul Foley, former PolyGram sales manager and vice president of sales for the catalog division in New York, testified that after speaking to DiMatteo, he was under the impression that Wennik was not a serious candidate for the job: "[M]y discussions with [DiMatteo] were basically that he felt that he needed to go through the motions of interviewing [Wennik], but it was clear to me that they were not -- meaning they, Ron DiMatteo and -- was not considering [Wennik] seriously."[5]

Curt Eddy, vice president of marketing, described who "we selected" for the other four field marketing positions and testified that "we didn't" consider Wennik for the New York-based

_____

[5]The judge allowed this comment only up to the point that DiMatteo was going through the motions, but struck the portion dealing with Foley's impression.

position.  Although this discussion referred to initial staffing decisions in March to April 1996, the jury could reasonably have concluded that the company used the same process seven months later when it finally filled the field marketing position.  Further, West Coast field marketing manager K.P. Mattson, whose deposition testimony was read into the trial record, stated that when he asked DiMatteo why the New York position remained unfilled, DiMatteo replied, "I wish Caparro and Madison would have shared with me their blackball list and not wasted my time with all this interviewing."  Although PolyGram points out that this exchange referred not to Wennik but to another candidate, the jury could have concluded from this evidence that Caparro and Madison indeed had a "blackball" list.

Moreover, at trial, the district court explained that it was allowing the handicap discrimination claim to go to the jury because:

> [A]t least Mr. Foley, and maybe somebody else, said that Mr. DiMatteo wasn't making the decision himself, that he felt as if some people were . . . "black ball[ed]" . . . . And that he was just going through the ropes. . . .
>
> . . . .
>
> . . . . I've got two people [Foley and Mattson] corroborating each other.  That's enough evidence . . . for a jury to conclude that Mr. DiMatteo did not make the decision and that he got a veto from someone who knew about the mental disability.

The jury could reasonably have concluded that higher officials in the company had veto power and had placed Wennik on their "blackball" list.

The jury also heard evidence that others within the company knew of Wennik's illness and that DiMatteo knew or could have inferred that Wennik had a handicap at the time he was not hired for the position.[6] Although DiMatteo testified that at the time he interviewed Wennik for the position, he was not aware of his mental difficulties, he acknowledged that he may have discussed Wennik's application for the field marketing job with Madison. It is clear that some other higher officials in the company were aware of Wennik's handicap. Madison had known of Wennik's illness as early as May 1995 and had discussed it with Caparro. In fact, Madison told Caparro that Wennik was "having trouble" even before Wennik himself disclosed his illness to Caparro in October 1995. Caparro also testified that others had brought to his attention their difficulties communicating with Wennik and that he met with Wennik in October 1995 to discuss the concerns being voiced by PolyGram's "national folks." At that meeting, Caparro observed that Wennik was "troubled, . . . anxious, . . . tense and that he

---

[6]While much of this evidence is circumstantial, we have held that circumstantial evidence alone may be sufficient to support a finding of knowledge. See Pontarelli v. Stone, 930 F.2d 104, 115 (1st Cir. 1991), abrogated on other grounds by Graphic Communications Int'l Union, Local 12-N v. Quebecor Printing Providence, Inc., 270 F.3d 1, 4 (1st Cir. 2001).

was tighter than ever before." Noting that he was "taken aback [at] how bothered and troubled [Wennik] was," Caparro suggested to Wennik that he take some paid time off, through the end of the year. Foley also testified that word had reached him from within the company that Wennik was not returning.

Further, during a conference call between DiMatteo and other branch managers, the managers were told that Wennik "needed to get away and was on a leave of absence."[7] The jury also heard evidence that DiMatteo and Caparro communicated frequently, and that a company announcement had been made about Wennik's leave, which DiMatteo understood to be for personal reasons. The jury could have inferred that Wennik's absence was at some point discussed with DiMatteo or that DiMatteo could have inferred that the leave was due to a handicap.

The jury could also have disbelieved DiMatteo's testimony based on contradictions of his testimony in the record. For example, in his affidavit, DiMatteo had stated:

> [a]lthough Mr. Wennik's hesitance to commit to relocating to New York in order to perform the field marketing manager position was an issue in my consideration of his candidacy, it was not a disqualifying factor. In fact, even if Mr. Wennik had committed to relocating to New York, I would not have selected him for the

---

[7]The witness could not recall who made the comment, but assumed it was Madison or Caparro.

-12-

position as I believed that Mr. Mangini was better suited to fill the role.[8]

At trial, however, DiMatteo explained that because Wennik had not committed to relocating, he could not consider him as a candidate.

After careful review of the record, we conclude that the evidence was sufficient for a reasonable jury to determine either that DiMatteo was not the sole decision-maker in filling the position or that he had knowledge of Wennik's handicap or both.

Second, PolyGram argues that the jury's verdict in its favor on the age discrimination claim precludes a finding that PolyGram's articulated reasons were pretext for handicap discrimination. Although PolyGram contends that this argument does not amount to a claim that the verdicts were inconsistent, PolyGram is, in effect, challenging the jury's seemingly inconsistent verdicts on the age and handicap issues. Addressing this argument would clearly require us to examine the verdict for inconsistency.

It is well-established that a party confronted by an inconsistent jury verdict has an obligation to call the inconsistency to the trial judge's attention. E.g., Campos-Orrego

---

[8]PolyGram points out that DiMatteo was a disinterested witness, having been laid off by the company more than a year before the trial. Even if DiMatteo had been a disinterested witness, a contention Wennik disputes, the jury was entitled not to believe him. See, e.g., Walton v. Nalco Chem. Co., 272 F.3d 13, 24-25 (1st Cir. 2001) (jury entitled to disbelieve trial testimony that one company vice-president discharged plaintiff without another vice-president's input); O'Connell v. Esso Std. Oil Co., 337 Mass. 639, 642 (1958) (jury was not required to believe testimony of apparently disinterested witness).

v. Rivera, 175 F.3d 89, 98 (1st Cir. 1999).  This Circuit follows the iron-clad rule that a party "waives [the issue of] inconsistency if it fails to object after the verdict is read and before the jury is dismissed."  Toucet v. Mar. Overseas Corp., 991 F.2d 5, 8 (1st Cir. 1993) (citations and internal quotation marks omitted); Bonilla v. Yamaha Motors Corp., 955 F.2d 150, 155-56 (1st Cir. 1992); Austin v. Lincoln Equip. Assocs., Inc., 888 F.2d 934, 939 (1st Cir. 1989); McIsaac v. Didriksen Fishing Corp., 809 F.2d 129, 134 (1st Cir. 1987).  Although PolyGram had ample opportunity to object to the potential inconsistency, the record is clear that it failed to do so.  It has therefore forfeited this argument.

To the extent that we review PolyGram's argument for plain error, we conclude that the circumstances of this case do not meet the stringent requirement that the alleged error "resulted in a miscarriage of justice or seriously affected the fairness, integrity or public reputation of the judicial proceedings."  Smith v. Kmart Corp., 177 F.3d 19, 28 (1st Cir. 1999) (citation and internal quotation marks omitted); see also Howard v. Antilla, 294 F.3d 244, 251 n.10 (1st Cir. 2002)

Finally, PolyGram argues Wennik failed to produce sufficient evidence to show that the real reason he was not selected for the field marketing position was "because of his handicap."  PolyGram contends that Wennik was not selected for the position because he failed to commit to relocating to New York,

failed to follow up with DiMatteo after the interview, and demonstrated a lack of enthusiasm for the position. PolyGram argues that its articulated reasons for not hiring Wennik are corroborated in the record and are not pretextual.

PolyGram further contends that Wennik failed to show any evidence that the "real reason" he was not selected was "because of" his handicap. The company points to the fact that it took no adverse action against Wennik because of his condition, gave him time to get well, kept his job open until he was able to return, and granted his requested accommodations when he returned to work. PolyGram also reiterates its argument that DiMatteo was not aware of Wennik's handicap at the time the field marketing manager position was filled. PolyGram argues that Wennik failed to produce evidence to contradict this or to establish that he would have been selected for the position "but for" his mental condition. It also contends that Wennik produced no evidence from which a reasonable jury could have concluded that the "real reason" Wennik was not hired was his handicap. In addition, PolyGram points out that the company initially brought up the idea that Wennik should consider interviewing for the position. Had the company wanted to discriminate against Wennik, PolyGram argues, it would not have encouraged him to interview for the position. PolyGram further argues that the record contains no indication that Wennik was suffering from a handicap at the time the field marketing position

was filled.  Nevertheless, the jury also heard evidence that Wennik still felt upset and anxious and experienced difficulties concentrating and performing his job when he returned from leave.

Wennik counters that the jury heard sufficient evidence to conclude that PolyGram did not hire him for the position because of his handicap.  As detailed, supra, the jury heard evidence that Caparro and/or Madison knew of Wennik's handicap and had expressed concerns about his condition.  The jury heard about the existence of a "blackball" list for the field marketing position and could have inferred that Caparro and/or Madison had placed Wennik on this list even before DiMatteo interviewed him.  The jury also heard evidence from which it could have inferred that DiMatteo knew of Wennik's handicap and/or that he was not the true decision-maker in filling the field manager position.

The jury also heard evidence from which it could have concluded that PolyGram's stated reasons for not hiring Wennik were pretextual and that its true reason was handicap discrimination. The jury heard that Wennik was qualified and enthusiastic about the job and had excelled and earned respect in his former position. The jury further heard evidence from which it could have inferred that PolyGram "maneuvered to establish a pretextual basis for" refusing to hire him for the position. See, e.g., Walton, 272 F.3d at 23-24 (jury could have found defendant orchestrated pretextual performance complaints from employer's administration of assessment

form to plaintiff after receiving letter for plaintiff's attorney); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (memo detailing legitimate grounds for discharge drafted after it became apparent former employee was bringing suit).

Wennik adduced evidence that the field marketing position for which he applied was the only one of Polygram's five field marketing positions for which the company conducted competitive interviews; the company "slotted" candidates into the other four positions without interviewing them. The jury also heard evidence from which it could have inferred that PolyGram shifted its position with respect to why it did not hire Wennik for the position. A significant portion of PolyGram's Equal Employment Opportunity Commission (EEOC) position statement detailed its concerns with Wennik's job performance.[9] At trial, however, DiMatteo testified that the reasons Wennik was not hired were his lack of enthusiasm and unwillingness to relocate to New York. Despite this, DiMatteo acknowledged in his deposition that he would not have hired Wennik even if Wennik had been willing to relocate.

---

[9]Although PolyGram contends in this position statement that Wennik's unwillingness to relocate to New York removed him from consideration for the field marketing position, the jury could reasonably have inferred that the extensive discussion about PolyGram's concerns with Wennik's job performance played at least some role in the decision not to hire him for the position.

He also acknowledged that Wennik had far more experience than the candidate PolyGram ultimately hired for the position.

We conclude that Wennik presented sufficient evidence from which a reasonable jury could find that PolyGram's proffered reasons for not hiring him for the position were pretextual and that the real reason was handicap discrimination. We therefore see no error in the district court's denial of PolyGram's motion for judgment as a matter of law on Wennik's handicap discrimination claim.

**B. Age Discrimination Claim**

Wennik contends that the trial court erred in denying his motion to alter or amend judgment for two reasons. First, Wennik argues that a finding of discrimination based on his mental handicap necessitates a finding of discrimination based on his age. In effect, he argues the verdicts are inconsistent and the inconsistency should be resolved in his favor. Second, Wennik asserts that he should have prevailed on the age discrimination claim based on the direct evidence he presented.

We review the trial court's decision denying a motion to alter or amend a judgment for manifest abuse of discretion. Jorge Rivera Surillo & Co. v. Falconer Glass Indus., 37 F.3d 25, 27 (1st Cir. 1994). We discern no abuse of discretion here.

Wennik first argues that this Court should read as consistent the jury's answers to the verdict questions, and in

doing so, should enter judgment in his favor on the age claim. He contends that, read together, the jury answers to the verdict questions are actually consistent. He argues that although the jury found that age was a motivating factor in PolyGram's decision not to hire Wennik, the company would have made the same decision not to hire him regardless of his age, because of his mental handicap. This contention is specious. Were we to accept it, we would be rejecting outright the jury's finding that there was no age discrimination.

Alternatively, Wennik argues that the jury answers to the verdict questions are inconsistent because the jury found that age was a motivating factor in the decision not to hire him for the position, yet concluded that PolyGram would have made the same decision not to hire him regardless of his age. Additionally, Wennik argues, the jury found that the reasons PolyGram offered for not hiring Wennik were pretextual and that the real reason for the decision was discrimination based on mental disability. Wennik argues that this Court should resolve the inconsistency in his favor by concluding that the jury intended to find age discrimination.

Like PolyGram, however, Wennik has forfeited his inconsistency argument. As discussed, supra, the rule is clear that Wennik was required to object to the alleged inconsistency

-19-

after the verdict was rendered and before the jury retired.  The record is clear that he did not do so.[10]

Wennik's second argument is that he should have prevailed on the age claim based on the direct evidence of age discrimination he presented.  Direct evidence "consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." Kirk v. Hitchcock Clinic, 261 F.3d 75, 79 (1st Cir. 2001) (citations and internal quotation marks omitted).  The evidence to which Wennik points is a disputed comment DiMatteo made during Wennik's interview for the field marketing position:  "When I get over 55, there's no way you'll find me in this business."

Despite the district court's finding that Wennik presented direct evidence of age discrimination, we conclude that this comment was not direct evidence. See, e.g., Fernandes v. Costa Bros. Masonry, 199 F.3d 572, 583 (1st Cir. 1999) (finding business owner's statements:  "I don't need minorities, and I don't need residents on this job" and "I don't have to hire you locals or Cape Verdean people" did not constitute direct evidence and concluding that "a statement that can plausibly be interpreted two different ways-one discriminatory and the other benign-does not

---

[10]Wennik's objection to a jury instruction when the jury asked for clarification on the word "based" is insufficient to preserve the inconsistency argument. Further, as stated, supra, this is not a case where the circumstances meet the stringent requirements of the plain error test.

directly reflect illegal animus and, thus, does not constitute direct evidence of racial discrimination."). Accordingly, we reject Wennik's direct evidence argument.

### C. **Attorneys' Fees**

At the close of the trial, the district court instructed the parties to use <u>Alfonso</u> v. <u>Aufiero</u>, 66 F. Supp. 2d 183 (D. Mass. 1999) and <u>Guckenberger</u> v. <u>Boston Univ.</u>, 8 F. Supp. 2d 91 (D. Mass. 1998), as guides in addressing the issue of fees and costs. On November 16, 2000, Wennik's counsel submitted a request for attorneys' fees. The application included affidavits from each of the attorneys, along with a "detailed accounting" of their time spent on the case based on their "contemporaneous time records." PolyGram opposed this motion on various grounds. On December 2, 2002, the district court issued a decision on Wennik's motion, instructing that "[t]he parties shall attempt to work out fair and reasonable attorneys' fees and costs" and citing to <u>Alfonso</u> and <u>Guckenberger</u>. Thereafter, counsel for both sides discussed the application for fees and costs. After this conversation, PolyGram's counsel sent a letter to Wennik's counsel, confirming that Wennik would "not be submitting a revised fee proposal in response to the Court's order that the parties attempt to work out

fair and reasonable attorneys' fees and costs . . . ." Wennik's counsel did not object to the letter.[11]

After reviewing Wennik's counsel's request for attorneys' fees, PolyGram took the position that the fees were excessive. In response, Wennik's counsel retained attorneys to represent them in the matter and submitted a request for a briefing schedule to the district court. Wennik's counsel also produced a new set of "renewed and revised" "contemporaneous time records," which included a new thirty-nine page document listing entries from March 17, 1998 through October 23, 2000. Although the new records did not indicate which attorney provided the services described, they contained new and more detailed entries about work performed on the days in question. PolyGram opposed Wennik's revised motion for attorneys' fees, arguing that the district court should not have accepted the revised time sheets, or, in the alternative, that the fees should have been significantly reduced under Alfonso and Guckenberger.

On July 3, 2001, with virtually no explanation as to its reasoning, the district court granted most of Wennik's motion for fees and costs, awarding $397,328.15 in fees and $8,961.91 in

---

[11]In his brief, Wennik's counsel objects to the introduction of the letter for various reasons. Even if the court were to consider the letter, however, the supplemental records do not violate its terms. The letter merely stated that counsel would not submit further material in response to the district court's order that the parties attempt settlement.

costs. The district court declined to accept the addition of ten extra hours that appeared in the revised records but not in the originals.

We review an award of fees and costs for abuse of discretion. Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992); Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 950 (1st Cir. 1984). This Court has "a duty to review carefully the basis for the award and to ensure that the amount is reasonable." Grendel's Den, 749 F.2d at 950. To allow for "meaningful appellate review," the district court must provide a "clear explanation of its reasons for the fee award." Id. "Conclusory statements concerning reasonableness are insufficient to withstand appellate review. . . . The attorney's account of the value of the legal services and the amount of time spent must be scrutinized with care." Id. (citations omitted).

PolyGram argues that the district court failed to provide any "thoughtful rationale" for its decision as required under Deary v. City of Gloucester, 9 F.3d 191, 197 (1st Cir. 1993), Grendel's Den, 749 F.2d at 950, and Alfonso, 66 F. Supp. 2d at 192 ("thoughtful analysis"). It also argues that the district court erred in allowing Wennik's counsel to submit revised billing records in response to PolyGram's claims that counsel's original records were deficient. Finally, it argues that the district court erred by failing to discount vague, non-compensable, and/or

duplicative time entries, resulting in an award of fees to which Wennik was not entitled.  PolyGram cites examples of an award for twenty-eight hours of work by one attorney on a single day; seventeen hours counsel spent waiting at the courthouse while the jury deliberated, see Alfonso, 66 F. Supp. 2d at 193 (noting that counsel were free to leave and/or work on other matters while waiting for a verdict); and time awarded, without any discounting, for three attorneys and one paralegal's presence during most days of the trial, Hart v. Bourque, 798 F.2d 519, 523 (1st Cir. 1986) ("the time for two or three lawyers in a courtroom or conference, when one would do, 'may obviously be discounted'").

Wennik disputes PolyGram's contention that the district court failed to provide reasons for the award, arguing that although the court's decision was concise, it made the requisite findings as to the major issues before it.  Wennik further argues that the court did not abuse its discretion in accepting counsel's revised time entries.  He also contends that his counsel's entries were not imprecise or vague, and offers alternative explanations for the argument that the court awarded fees for non-compensable time, such as the twenty-eight hour work day for one attorney.

We see no abuse of discretion in the district court's acceptance of Wennik's counsel's revised time records.  PolyGram points to no case law that bars the acceptance of such time records.  In fact, the cases suggest that acceptance of revised

time records is not uncommon.  See, e.g., Alfonso, 66 F. Supp. 2d at 191 (acknowledging, without comment, plaintiff's submission of "more detailed descriptions of the work performed); Bull v. Coyner, No. 98 C 7583, 2001 WL 630669, at *3 n.2 (N.D. Ill. 2001) (using revised time records to calculate attorney time); Torf v. Metromedia Paging Servs., No. CV-93-4031, 1996 WL 118559, at *4-5 (E.D.N.Y. 1996) (taking into consideration plaintiff's attorney's revised time records in denying plaintiff's motion to reconsider denial of attorneys' fees).  Rule 54 of the Federal Rules of Civil Procedure requires the filing of a fee petition within fourteen days of entry of judgment.  Particularly in light of this short time frame, we see no abuse of discretion where the court accepted a party's additional details of time records in a case that covered four years of litigation.

The district court's decision, however, generally was not illuminating in its reasoning on the grant of the fee award.  Given the discrepancies, including the award for twenty-eight hours of work in one day by one attorney, and the case law requiring the district court to explain its rationale for a fee award, we vacate the award and remand this issue to the district court for a redetermination of attorneys' fees and/or an explanation of its reasoning.

## III. <u>CONCLUSION</u>

We **AFFIRM** the verdict on the handicap and age discrimination claims and **REMAND** to the district court on the issue of attorneys' fees.  No costs for either party on appeal.